IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

TERRENCE L. MAJETTE,

                  Plaintiff,

     v.

PATROLMAN TURNER, PATROLMAN
MARTINO, MAPLE SHADE POLICE
DEPARTMENT, TOWNSHIP OF MAPLE
SHADE, BURLINGTON COUNTY
DETENTION CENTER, JOHN/JANE
DOES and/or ABC COMPANIES 1-3,
jointly and severally and/or
in the alternative,

                  Defendants.

HONORABLE JEROME B. SIMANDLE

Civil Action No.
15-5960 (JBS/JS)

**OPINION**

APPEARANCES:

Thomas J. Gosse, Esq.
126 White Horse Pike
Haddon Heights, NJ 08035
    Attorney for Plaintiff

J. Brooks DiDonato, Esq.
Parker McCay
Three Greentree Centre
Route 73 & Greentree Road
Suite 401
Marlton, NJ 08053
    Attorney for Defendants Turner, Martino, Maple Shade Police
    Department, and Township of Maple Shade

Michelle L. Corea, Esq.
Capehart and Scatchard, P.A.
Laurel Corporate Center
8000 Midatlantic Dr.
Suite 300
Mount Laurel, NJ 08054
    Attorney for Defendant Burlington County Detention Center

**SIMANDLE, District Judge:**

**I.    INTRODUCTION**

This case arises from an incident that occurred in a holding cell at the Burlington County Jail. Officers from the Maple Shade Police Department transported Plaintiff Terrence L. Majette to the county jail following his arrest in Maple Shade Township. Plaintiff was injured after he was pushed into the holding cell while handcuffed, where he fell backwards and struck his chin on the cell bench. The officers contend that they reflexively pushed Plaintiff out of the way of an automatic moving steel door; Plaintiff contends that he was in no danger of being crushed by the door and the officers pushed him "purposely and maliciously." The incident was captured on video from two views. The principal issue is whether the video evidence is undisputed and resolves what would otherwise be a dispute of fact about the physical contact between the officers and Mr. Majette.

Before this Court are two motions for summary judgment, one filed on behalf of Burlington County [Docket Item 26] and one on behalf of Officer Turner, Officer Martino, the Maple Shade Police Department, and Maple Shade Township [Docket Item 27]. For the reasons that follow, the Court will grant both motions in their entirety.

## II.  BACKGROUND[1]

Plaintiff was arrested by officers from the Maple Shade
Police Department following a domestic violence call on June 21,
2013. (Officer Turner's Initial Uniform Supplemental
Investigation Report ("Turner Report") at 1-2.) Plaintiff was
transported back to the Maple Shade police headquarters for
processing, where Officer Turner reported that Plaintiff was
"belligerent, defiant, and uncooperative, although [Officer
Turner] did nothing to provoke" him. (Id. at 3.) Plaintiff
conceded that he was not cooperative because he was arguing with
the officers. (Deposition of Terrence Majette ("Majette Dep.")
at 25:16-25.) After Plaintiff was unable to post bail, he was
informed that he would be lodged at the Burlington County Jail
in default of bail. (Turner Report at 3.)

Officers Turner and Martino were directed to transport
Plaintiff from the Maple Shade Police Headquarters to the
Burlington County Jail. (Id.) Officer Turner reported that
Plaintiff refused to comply with directions and made it
difficult for officers to handcuff him and escort him to the
patrol vehicle. (Id. at 4-5; see also Officer Dugan's Initial
Uniform Supplemental Investigation Report.) During the course of

---

[1] The Court distills this undisputed version of facts from the
parties' statements of material facts, affidavits, and exhibits,
and recounts them in a manner most favorable to Plaintiff, as
the party opposing summary judgment.

the transport, Plaintiff apparently continued to refuse to comply with officers' directions, repeatedly banging his head against the plastic divider separating the front seat from the back seat, asking to "make a deal" to avoid jail time, and calling Officer Turner "a racist." (Officer Turner's Supplementary Investigation Report ("Turner Supplement") at 1-2; see also Officer Martino's Uniform Supplementary Investigation Report ("Martino Report") at 1.)

Upon arrival at the Burlington County Jail, the officers brought Plaintiff through the sally port to the holding area for processing. As the surveillance video from the County Jail shows, this entrance to the jail is separated into two rooms by windows and a metal door; one, a waiting area in which officers can fill out paperwork and pass the forms to the corrections facility's office, and the other, a holding cell with a bench along the perimeter of the room, which Officer Turner estimated is about 12 feet away from the door. (See Burlington County Jail Video, Door View Video; see also Deposition of William Turner ("Turner Dep.") at 14:20-25, 23:5-9.)

Plaintiff stepped out of the vehicle and away from Officer Martino. (Turner Supplement at 2.) Plaintiff stated "I know where I'm going" and began walking in a different direction. (Id.) Officers Turner and Martino directed Plaintiff to a holding area and ordered him to sit down. (Id. at 2-3.)

4

The door to the holding area began to close. (Id. at 3.) This door "is a heavy steel door, mechanically operated, which slides closed parallel to the doorframe" and is "operated by a Corrections Officer seated in a separate room." (Id.)

At this point, the parties' accounts of the facts diverge.[2] Officer Turner states that at this time, Plaintiff "walked back towards officers and stood in the threshold" of the steel door and had to be moved by "a gentle push to the chest." (Turner Supplement at 2.) Despite orders to sit down, Plaintiff apparently returned to the threshold and stood in the way of the door again, at which time both officers "pushed the accused in the chest to clear him from the doorway" because they were "in fear for the safety of [Plaintiff] and it was unclear if the door would stop closing if he continued to stand in its path." (Id.; see also Turner Dep. at 17:2-19, 21:1-22:17.) Officer Turner explained that he did not turn around and ask the Corrections Officer monitoring the mechanical door to stop its progress because in his experience "the closing of the door is not closely monitored by Corrections Officers" and because "all

_____

[2] Defendants submitted video from three surveillance cameras at the Burlington County Jail, covering Plaintiff's arrival at the jail in the Maple Shade Police Department vehicle, the events in the holding cell, and his later return to the jail from three different perspectives. (See Burlington County Jail Video (Cell View, Door View, and Entering-Exiting Sallyport Video Files).) Plaintiff does not challenge the authenticity of this video.

this was taking place within seconds of entering the intake facility." (Turner Supplement at 2.) Officer Turner recounted that as Plaintiff was pushed "and the door slammed shut, [Plaintiff] was seen to fling himself across the room and fall to ground," believing that he "intentionally and dramatically threw himself to the ground with the sole intention of causing injury to himself in yet another attempt to avoid being incarcerated." (Id. at 3-4; Turner Dep. at 22:22-23:9 ("The force . . . with which we applied to him was not consistent with the movements that he made. . . . And he went from the door to the other side of the room with not sufficient pressure to move him there.").) While waiting for nursing staff to appear, Officer Turner recounted that Plaintiff "continued to yell at [him], making homophobic slurs directed towards [him], and threatening [him]." (Turner Supplement at 4.)

Officer Martino likewise reported that Plaintiff "failed to comply with our directives and began walking toward the steel door of the cell which had begun to close." (Martino Report at 1.) Officer Martino stated that "Fearing that the door would cause [Plaintiff] serious bodily harm, I pushed the accused with my left hand finger tips in the middle of his chest at the same time as Ptl Turner had pushed him in order to clear him out of the doorway" two times in order to remove him from the threshold. (Id. at 1-2; see also Deposition of Brian Martino

("Martino Dep.") at 23:11-21, 26:19-29:2, 32:1-33:6.) Both
officers noted in their reports that they used only the force
necessary to clear Plaintiff from the doorway.

On the other hand, Plaintiff maintains that he approached
the door in the holding cell because Officer Turner was
provoking him, but that he never crossed the threshold and that
he "halted right there at the door to finish my conversation
with" Officer Turner. (Majette Dep. at 39:1-14, 41:16-42:9,
44:23-45:1.) Plaintiff testified that he noticed that the door
was closing and that "I was going to move my own head" out of
the way because "look[ing] at that door and you know that's a
heavy door, you're going to get crushed like a watermelon" and
that he knew "not to go past the threshold, period." (Id. at
45:19-46:13.) He recalled that "the next thing I know I woke up
on the floor in my blood." (Id. at 44:10-13.)

A few minutes later, medical personnel and Corrections
Officers arrived and administered first aid to Plaintiff.
(Turner Supplement at 4; Martino Report at 2.) Burlington County
Jail personnel refused to accept Plaintiff until he received
medical treatment and clearance for the injury to his chin.
(Id.) At the direction of Sargent Dugan of the Maple Shade
Police Department, Plaintiff was released from the holding cell,
returned to the custody of the Maple Shade Police, and
transported to an emergency room in Mount Holly. (Id.) After

further apparent difficulty, Plaintiff received two stitches to his chin and was discharged from the hospital. (Turner Supplement at 5-6; Martino Report at 2-3.) Plaintiff was transported back to the Burlington County Jail and eventually cleared by medical personnel and lodged in the jail. (Id.)

As of the time of his deposition, Officer Turner was an eight-year veteran of the Maple Shade Police Department and had no other excessive force complaints filed against him. (Turner Dep. at 7:17-19, 8:19-9:12.) He had transported prisoners to the Burlington County Jail "dozens . . . possibl[y] hundreds" of times before this incident. (Id. at 11:14-24.) At the time of his deposition, Officer Martino was a four year veteran of the Maple Shade Police Department and likewise had no prior excessive force complaints filed against him. (Martino Dep. at 9:8-12, 11:1-12.) He had transported prisoners to the Burlington County Jail "approximately 10 to 20 times" before this incident. (Id. at 21:12-14.)

Both officers testified that they had been provided by the Maple Shade Police Department with formal department policies, rules, and regulations, and that they are also trained by "working with other officers and going through the field training program," about, inter alia, transporting prisoners to the county jail. (Turner Dep. at 9:23-11:9; Martino Dep. at 11:17-17:14.) All officers receive a written policy that must be

reviewed annually, and undergo use of force training and testing twice a year. (Martino Dep. at 10:12-25, 14:7-14.) Neither received any training or policies and procedures from the Burlington County Jail about transporting prisoners. (Turner Dep. at 11:25-12:10; Martino Dep. at 17:15-19:1.)

Plaintiff filed a five-count complaint against Officer Turner, Officer Martino, the Maple Shade Police Department, Maple Shade Township, and the Burlington County Jail,[3] alleging violations of 42 U.S.C. § 1983 and the New Jersey Civil Rights Act of 2004, N.J.S.A. 10:6-1-2 based upon a claim of excessive force. Discovery has closed, and now Defendants have filed motions for summary judgment [Docket Items 26 & 27] which Plaintiff opposes [Docket Items 31 & 32]. The Court will decide this motion without holding oral argument pursuant to Fed. R. Civ. P. 78.

## III. STANDARD OF REVIEW

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported

---

[3] The real party in interest is Burlington County. The Burlington County Jail is not a "state actor" within the meaning of § 1983. See Crawford v. McMillian, 660 Fed. Appx. 113, 116 (3d Cir. 2016) ("[T]he prison is not an entity subject to suit under 42 U.S.C. § 1983.") (citing Fischer v. Cahill, 474 F.2d 991, 992 (3d Cir. 1973)).

9

motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In reviewing a motion for summary judgment, the court is required to examine the evidence in light most favorable to the non-moving party, and resolve all reasonable inferences in that party's favor. Scott v. Harris, 550 U.S. 372, 378 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014).

Nevertheless, where, as here, there is indisputably authentic and complete video footage related to the claims, the Court will not draw inferences that are "blatantly" inconsistent with the video evidence, and the Court may rely upon that video to reject a recollected version of disputed events. See Scott, 550 U.S. at 380–81 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). In other words, the existence in the record of a videotape capturing the events underlying a claim presents an "added wrinkle" to the usual standard which requires courts "to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" Id. at 378 (citations omitted).

A factual dispute is material when it ''might affect the outcome of the suit under the governing law,'' and genuine when ''the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'' <u>Anderson</u>, 477 U.S. at 248. The non-moving party ''need not match, item for item, each piece of evidence proffered by the movant,'' but must simply present more than a ''mere scintilla'' of evidence on which a jury could reasonably find for the non-moving party. <u>Boyle v. Cnty. Of Allegheny Pennsylvania</u>, 139 F.3d 386, 393 (3d Cir. 1998) (quoting <u>Anderson</u>, 477 U.S. at 252).

## IV. DISCUSSION

Plaintiff brings claims arising out of this incident against Officers Turner and Martino, as individuals, and against Burlington County, Maple Shade Township, and the Maple Shade Police Department, as municipalities, pursuant to § 1983 and the New Jersey Civil Rights Act. Defendants seek summary judgment on all counts. The Court will discuss each defendant in turn.

### 1. Burlington County

Plaintiff's claims against Burlington County arise from the municipality's alleged unconstitutional policy or custom in failing to supervise, discipline, train, or otherwise sanction local police officers like Officers Turner and Martino. (Complaint Count V at ¶¶ 2-6.)

It is well-established that municipal liability under § 1983 "may not be proven under the respondeat superior doctrine,

but must be founded upon evidence that the government unit itself supported a violation of constitutional rights." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (citing Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658 (1978)). As a consequence, a municipality is liable under § 1983 only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Monell, 436 U.S. at 694. "[I]t is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom." Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990).

Specifically "[w]here the policy concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to deliberate indifference to the rights of persons with whom those employees will come into contact." Thomas v. Cumberland Cnty., 749 F.3d 217, 222 (3d Cir. 2014) (internal quotation and citation omitted). In other words, "a municipality can only be liable under § 1983 where the failure to train demonstrates a 'deliberate' or 'conscious' choice by the municipality." Doe v. Luzerne Cnty., 660 F.3d 169, 179 (3d Cir. 2011). To determine whether a municipality's alleged failure to train gives rise to municipal liability, a plaintiff must show that "(1) municipal

12

policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." <u>Carter v. City of Phila.</u>, 181 F.3d 339, 357 (3d Cir. 1999).

Here, the record does not support Plaintiff's claim that the County's alleged failure to train Maple Shade police department officers caused his injuries. He has not adduced any evidence of a particular or specific policy or custom on the part of the County, identified the policymakers or decisionmakers behind the policy, or shown a pattern of similar constitutional violations. Indeed, it is unclear what deficient policy Plaintiff's failure to train claim is premised on: whether the County should have trained local police officers on the use of force; on how to use the automatic door; on procedures for handling inmates in the holding cell. Moreover, Plaintiff has failed to adduce any evidence that Burlington County had an obligation under the law to train Maple Shade Police Department officers who were not employees of the County or the correctional facility.

To the extent that Plaintiff's allegations against Burlington County are premised on the County's failure to train or supervise Correctional Facility employees who should have

intervened before the Maple Shade police officers resorted to the use of force, Plaintiff's claim is similarly deficient. Again, without a developed factual record as to who the policymakers or decisionmakers at the County were, the "deliberate" or "conscious" choices that were made, or a past record of a pattern of similar constitutional violations at the County Jail's holding cell, Plaintiff has not shown that the municipality is liable for any constitutional violations. Plaintiff has the burden of producing admissible evidence supporting his <u>Monell</u> claim against the County and has offered no facts regarding training, custom or policy of the County from which a reasonable jury could find the County liable.

Accordingly, the motion for summary judgment by Defendant Burlington County will be granted.

### 2. Maple Shade Township and the Maple Shade Police Department

Plaintiff's claims against Maple Shade Township and the Maple Shade Police Department ("the Maple Shade Municipal Defendants") likewise arise from the municipality's alleged unconstitutional policy or custom in failing to supervise, discipline, train, or otherwise sanction its police officers. (Complaint Count V at ¶¶ 2-6.)[4]

---

[4] Count IV of the Complaint alleges that the "negligent acts" of the Township "were the proximate cause of plaintiff's injuries and such negligence is imputed to defendants." It is black-

As with his claims against Burlington County, Plaintiff cannot prove that the Maple Shade Municipal Defendants are liable under § 1983 for a failure to train their police officers. While in this instance Plaintiff's theory of liability is clearer – the Maple Shade Municipal Defendants failed to train officers "with regard to the operation of the holding cell at the county jail" (Pl. Opp. at 12) – Plaintiff has again failed to adduce evidence that this was a "deliberate" of "conscious" choice on behalf of any policymakers or decisionmakers with the municipality, or that there has been a history of a pattern of similar constitutional violations.[5]

Accordingly, the Maple Shade Municipal Defendants are entitled to summary judgment.

### 3. Officers Turner and Martino

---

letter law that a municipality cannot be liable for negligent conduct that leads to a constitutional violation – only a showing of deliberate indifference will do. Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. V. Brown, 520 U.S. 397, 407 (1997) ("A showing of simple or even heightened negligence will not suffice."). Accordingly, the Maple Shade Municipal Defendants are entitled to summary judgment on that cause of action.

[5] In fact, the record in this regard suggests the opposite: neither officer had any excessive force complaints against him before this incident, and both reported that they had committed other arrestees to the custody of the County Jail many times without incident. Plaintiff has adduced no evidence to the contrary; there is no material fact in dispute regarding the discipline, training or fitness of these officers to apprehend and transport individuals to the Burlington County Jail and to safely situate them in the holding cell.

Finally, Plaintiff claims that Officers Turner and Martino, as individuals, violated his state and federal constitutional rights in pushing him into the holding cell at the Burlington County Jail while handcuffed. (See Complaint Counts I-III.) The officers contend that they are entitled to summary judgment on these claims because the undisputed facts show that they used reasonable force, or in the alternative because they are entitled to qualified immunity.

The Fourth Amendment prohibits the use of excessive force by a law enforcement officer. Carswell v. Borough of Homestead, 381 F.3d 235, 240 (3d Cir. 2004). Whether a given instance of force is excessive depends on the objective reasonableness of the force used under the circumstances. Id. The "reasonableness" of the use of force is evaluated in light of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. (citing Graham v. Connor, 490 U.S. 386, 395 (1989)). The Court should not apply "the 20/20 vision of hindsight," but should instead consider the "perspective of a reasonable officer on the scene." Graham, 490 U.S. at 396.

Here, both officers testified that Plaintiff was "belligerent, defiant, and uncooperative" at the Maple Shade police department headquarters, during transport, and upon

16

arrival at the Burlington County Jail. Both recounted that,
despite repeated orders to sit down in the holding cell,
Plaintiff stood in the threshold of the cell door while the
steel door was sliding closed, and that they each pushed him out
of fear that the door would seriously harm Plaintiff.
Plaintiff's version of the facts differs: he testified that he
"halted right at the door" but did not, and would not have,
cross the threshold because he knew the door could hurt him and
he could face serious trouble for attempting to flee. Plaintiff
contends that the officers were provoking him and pushed him out
of "malice."

Ordinarily, the contrasting accounts of what happened in
the parties' reports and deposition testimony would present
factual issues as to the reasonableness and degree of the force
used, and would preclude the entry of summary judgment. But in
this case, the videotape of the events in question "quite
clearly contradicts the version of the story" told by Plaintiff.
Scott v. Harris, 550 U.S. 372, 378 (2007).[6] Despite Plaintiff's

---

[6] Scott concerned a car chase, and one of the issues before the
Court was whether there was a material factual dispute as to
whether the motorist "was driving in such a fashion as to
endanger human life." 550 U.S. at 380. The Court of Appeals had
adopted the motorist's, as the nonmovant on summary judgment,
version of the facts that, during the chase, "there was little,
if any, actual threat to pedestrians or other motorists, as the
roads were mostly empty and [respondent] remained in control of
his vehicle." Id. at 378. The Supreme Court held that this was
in error, in light of the existence of a videotape that "tells

17

contention that he did not cross the threshold or get in the way of the steel door, the video shows a substantial portion of Plaintiff's body crossing the threshold of the cell door twice in quick succession. (See Cell View Video at 1:58:05 and 1:58:08; Door View Video at 1:58:05 and 1:58:08.) Rather, the video confirms the officers' testimony that Plaintiff stood in the direct path of the steel door, and that they pushed him out the door's path in fear for his safety. That Plaintiff was handcuffed at the time is immaterial to their belief that he posed "an immediate threat to" his own "safety" in that split second. Graham, 490 U.S. at 395. Likewise, the video confirms that the officers did not use excessive force to clear Plaintiff from the door's path. Each officer used a single, open hand to push Plaintiff in the chest, without stepping towards Plaintiff or winding up, in the manner that an ordinary person might push a companion out of the path of a falling object. The video

---

quite a different story." Id. at 379. The Court clarified the standard on summary judgment where indisputably authentic video evidence exists: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment . . . [and thus, t]he Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape." Id. at 380-81. In other words, where, as here, video evidence exists that "blatantly contradicts" one party's story, the parties' dispute of fact is not "genuine" for the purposes of summary judgment.

similarly contradicts Plaintiff's position that he was knocked unconscious by the officers, as he can be seen to move around his cell continuously after the incident.

In sum, the indisputably authentic video shows from two simultaneous views that Plaintiff was stepping into the path of the heavy sliding cell door and that the police used only the force necessary to save him from harm by pushing him back away from the door. No reasonable jury viewing the video evidence of the incident could find that the officers used force beyond what was necessary to protect the Plaintiff from the closing automatic cell door, in precisely the manner they have described. In the absence of any <u>genuine</u> dispute of fact over Plaintiff's proximity to the heavy automatic steel door as it was closing, the Court finds as a matter of law that the officers committed no constitutional violations by their conduct.[7] For this reason, the Court will grant the individual officers' motion for summary judgment.

---

[7] Accordingly, because the Court finds that there is no constitutional violation, it need not address whether Officers Turner and Martino are entitled to qualified immunity for their actions. As a matter of qualified immunity, however, even if the precise amount of reasonable force was debatable, the Court must give "deference to the judgment of reasonable officers on the scene," <u>Saucier v. Katz</u>, 533 U.S. 194, 205 (2001), and the officers would be entitled to qualified immunity in these circumstances.

**V.    CONCLUSION**

An accompanying Order will be entered.

**July 18, 2017**
Date                                          **s/ Jerome B. Simandle**
                                              JEROME B. SIMANDLE
                                              U.S. District Judge